Oral argument not to exceed 15 minutes per side. Kenneth David Feingold for the appellant, you may proceed. Good morning. Good morning. Melissa Richmond, and I would like to reserve two minutes for rebuttal. There basically are two issues presently before this court arising out of the 49 day incarceration of the appellant, Melissa Richmond, in the Wayne County Jail. The first issue consists essentially of the violation of Miss Richmond's clearly established right to receive the entirety of care that was ordered while at the Wayne County Jail. A right that has been clearly established essentially since the court's ruling in 1976 in the Estelle v. Gamble case. The second issue before this court is the right of Miss Richmond to receive timely access to her psychiatric medications for known serious psychiatric illness that was unreasonably delayed for a period of approximately three weeks due to the, or I should say despite actual knowledge of a serious psychiatric need, the deliberate and reckless disregard of that actual knowledge of serious psychiatric need, and a practice of the Wayne County Jail in withholding, if you will, access, timely access, to some but not all inmates at the Wayne County Jail. Was there conflicting testimony on that issue as to whether, I know they would assign them to the mental health, inpatient mental health, outpatient, but wasn't there testimony that the practice was to call when an inmate comes in and has drugs or a prescription? The practice was simply to call, get the name of the pharmacy, call the pharmacy, and provide the drugs. Was that only if you went into the inpatient? Or did they sometimes do that and sometimes not if you were outpatient, mental health unit? It's really neither. What happens is there is an initial screening at booking. The screening essentially takes place by a jail social worker. The social worker takes down a history. And if that history shows that there is a psychiatric condition, need, treatment, medications, et cetera, then that person makes a decision. Is this somebody that should be in mental health unit, as an inpatient, so to speak, or mental health outpatient? They are the gatekeeper, if you will. It's questionable whether that is a person who truly has the ability to even make that distinction. And the reason I say that is because of inmates precisely like Ms. Richmond, not who may have had a condition remotely in the past. Something, a history of psychiatric illness or mental illness remotely in the past, taking medications in the past. This is a contemporaneous history. The history was that she had taken her psychiatric, psychotropic medications the very day of her arrest. And that she was actively under the care of team mental health, if you will. I guess what I'm trying to understand is the social worker that does that intake, somewhere in the record was also called a psychiatric social worker. Is that right? I believe so, yes. Okay. So that person then makes the division, inpatient, outpatient. I understand that. Is there not a separate, I know in many other cases we've seen it and I thought there was discussion of it by the gentleman, the first intake person that said that we will, intake, they'll tell us they're on prescription drugs, we'll call the pharmacy. And we call the pharmacy, we get the drugs, they're there, we just proceed. Is that not done here? There is conflicting testimony in this record on that very point because it depends who you ask. If you ask the psychiatric social worker, he testified that that's the duty of the intake nurse, in this case, Siobhan Fowler. If you ask, when we asked Nurse Fowler, she said, no, no, that's the job of Mr. Miftari, the jail psych. All I have to do is hear the words, I have a psychiatric condition, and I flag it, and in comes Mr. Miftari. If you ask Dr. Clafton, Dr. Clafton testified that it was Nurse Fowler's job to do it at intake. So there was a complete failure to follow the most basic, common sense protocol in this case. In addition to Ms. Richmond having taken certain psychiatric medicines that day, did Ms. Richmond indicate or anyone indicate on her behalf that she had a particular diagnosis of a particular mental condition? Oh, yes. Who did and what was the condition? It was bipolar? Yes, yes. Bipolar disorder. There is history taken by Mr. Miftari of hallucination, as well as suicide ideation, as well as depression, anxiety, and the most immediate cause of her presence in the jail was a self-inflicted second to third degree burn. So it's clear that this woman had some psychiatric issues in place here. So why is this not a negligence case as opposed to a deliberate indifference case? Well, it's a deliberate indifference case because the standard is very simple, and it takes two forms here because we're claiming individual liability on the part primarily of Miftari on this account, as well as a Monell claim for the practice of the Wayne County Jail. But first and foremost is the individual liability of Miftari who had actual knowledge of a serious psychiatric need and recklessly disregarded that substantial risk to inmate health or safety. Remember, he is advised that this woman has a serious medical or psychiatric condition. I even asked him, isn't hallucination, isn't that important? He says, well, it might be or it might not be something rather nebulous. And I says, well, it sounds to me like being a little pregnant, okay? If you have hallucinations, that's serious. But wouldn't it depend when the hallucinations had been, whether they were recent or a long time ago? Well, if you were to focus exclusively on that one point, if you will, then yes, maybe it would be. I mean, if it was something 10 years before, but we're hearing it in a constellation, if you will, of multiple psychiatric symptoms, manifestations, and illness. The woman is taking Prozac, she's taking Xanax. These are serious psychiatric, psychotropic medications. And this is not just something, well, geez, I have a headache, I should take two aspirin and I'll feel better. But notwithstanding that, why does this one cross the deliberate indifference line rather than remaining on the negligence side? Is it the three weeks? Is it, because in the law, I don't think there's a basic line in terms, a demarcation rather, in terms of the number of days which pushes it over one to the other. So what are the facts that really make this one deliberate indifference rather than just negligence or even gross negligence? Understood. And again, in terms of individual liability, it becomes, I mean, what is the standard for deliberate indifference? The deliberate indifference is what did you know and what did you do? And if you have actual knowledge and you recklessly disregard a substantial risk, then that is, by definition, deliberate indifference. Or if there's a question of fact, it's for the jury to decide. So I guess on the face of it alone, the district court says, well, he made a command decision. And if he's wrong, well, then okay, stuff happens. But what Miftari actually said, and this is how we segue back into the Monell claim, is he says it would be ideal if people could get their medications right away, including Ms. Richmond, presumably. But that's just out of my hands. That's a quote. Why? Because we have a backlog here. We have a backlog of 300 mental health patients. And for that reason, it just simply takes that long for a person, such as Richmond, to see a psychiatrist. Now, why does it take that long? That's ridiculous. That's not someone who might be at risk. That is a person at risk. She has known psychiatric medications. And it's an unconstitutional practice, not least of which because of the duration of the amount, even though there's no red line, so to speak, because there is no reasonable basis for this rule or for this practice. Because it's so easily abated. All you have to do is call the doctor, call the pharmacy, to confirm what we already know by virtue of her own history, that I take these medications. So there's no rational basis for this practice. Couldn't the jail be sued if they continued the prescription of Dr. X on the outside, and it turns out Dr. X on the outside is a jerk and doesn't know what he's doing and is giving the wrong meds? No, because what I am suggesting is that a simple phone call to the doctor who prescribes... I'm saying hypothetically that doctor is an incompetent doctor prescribing the wrong meds for somebody who's bipolar. And if the jail continues those meds without doing an independent evaluation, wouldn't the jail be liable for doing that and the person acts out for whatever reason? Sure. It's an interesting question and interesting hypothetical, but I would doubt very much that there would be a violation of the standard of care, if you will, which would be basically a medical malpractice type of case, as opposed to even approaching the level of constitutional violation. So I don't know that that is truly something that the county would have to worry about exposure on in that regard. I know you have another claim and your yellow light is on already. So if you would explain why there's a deliberate indifference claim against any particular individual for the failure to properly treat the burns. Sure, sure. I would be happy to try to wrap it up here. It's not really a failure to properly treat the burns. That's not the complete formulation of the issue here. The issue is, because we have no issue with the care that was ordered. She had a right to receive the care that was ordered. That's beyond dispute. I thought there was a dispute as to whether or not the dressings were to be changed once or twice a day. It's really not a real dispute, because the first order was given for once daily changes, and then it was increased to twice daily changes on January 9th and January 11th. But if that's not your claim, why don't you tell us what is your claim regarding the burns and the dressings? Because I thought it was as Judge Moore stated it initially. Well, with all due respect, it's a little bit more refined than the formulation of Judge Moore. The point is, she didn't get what she was entitled to, and it wasn't a de minimis violation of the failure to provide the totality of care. If you count the once daily and then twice daily that she was ordered, she would have been entitled to 84 dressing changes. She got 16. But didn't that end when she agreed to change the dressings herself twice a day? Well, it's funny that you mention agreed. She asked from the start. Give me materials. I'll do it myself. You folks aren't doing it for me. I'm entitled to the two. I'll do it myself. She wasn't even provided that until a month later. So for purposes of the discussion, I will grant that beginning in January 23rd, which is still three weeks before her discharge. With no discontinuation of that order, she doesn't get anything. Now, she is given some materials to change the dressings on her own, and whether or not that was substantial to last the next three weeks, I guess, is unknown precisely. But the fact of the matter remains that given what she was ordered and what she received, she was deprived of literally 80% of the care, the changes that she was ordered. So in terms of qualified immunity and individual liability, which person was liable? Very good question, because essentially this is where the error of the district court was. The district court stated that I did not establish individual liability, but the only way the district court could draw that conclusion is by ignoring plaintiff's favorable proof, which consisted of a contemporaneous log of events written at the time the events are being described. It was about 20 pages in length, which is attached, as well as the sworn deposition testimony. It was totally ignored by the district court in rendering his decision. But specifically, I'm curious, who was responsible for what, in your view? Exactly. So I go from the general to the particular. In the log of events, she clearly identifies, as noted verbatim in my briefs, Nurse Lahnberger, Nurse Hawk, Nurse Danielle Allen, and Nurse, I believe, Nurse Fowler. In particular, many of these were referred to as Nurse X and Nurse Y. Remember, as a detainee in the jail, as opposed to maybe even a prisoner confined in the state system over a long period of time, it's very difficult to know anybody's name. They don't wear big name tags that say, hello, my name is. She knows she's being denied by particular individuals by virtue of their language, their words, and their actions. With the benefit of hindsight, we know now who Nurse X is and Nurse Y is because we can check it against the medical chart as to who had interaction with her during that period of time. In particular, there was a Nurse Lahnberger who was aggressively trying to hurt her, at least according to Ms. Richmond, her log, her deposition testimony, as well as references in the chart itself. Unfortunately, your red light is on, and we will certainly allow you to rely on your briefs and give you your argument in rebuttal. But if any of the judges have any further questions, otherwise, I think we should hear from the other side. Good morning. Good morning. My name is Davide Stella, and I represent all defendants in this matter. Unless the court has any initial questions about what Mr. Feingold just said, I wanted to address a couple of issues, starting with the mental health issues and moving on to the burn wound. I think Judge Moore kind of hit it on the head. It's important to realize that once a prisoner or a pretrial detainee, as Ms. Richmond was, enters the Wayne County Jail, they become the patient of the Wayne County Jail. And the reason why this is important is all the medical testimony in this case is that as doctors and nurses, we have a duty to complete an independent diagnosis regardless of what an outside doctor may have said days, weeks, or months. And it's precisely for the reason that we can't just simply say, can't rely upon an inmate's self-reported medical history. Even though you have that duty, don't you also have a duty to complete that independent examination timely? And if there's a situation where a detainee is at medical risk, you still have the duty, but you have a duty to make certain that that detainee is cared for properly during that interim, don't you? I agree, Your Honor. And let me explain a little bit about Melissa Richmond's situation. Now, it's important to, you know, Ms. Richmond testifies that she had taken Prozac or Xanax the day she was arrested. Ms. Richmond didn't have either medication on her when she was arrested. So when she comes to the city police department and to Wayne County, all of her property is inventory that she had with her when she was arrested. She didn't have either drug on her. Most people don't run around with all their medicines on them. Well, for sure, but remember, Ms. Richmond was at a family party all day before her arrest. So you'd think that if she had taken it, she would have taken it in. Well, I mean, I don't want to speculate, but see, that's the first thing. So if an inmate comes in with a prescription that says, my name, this is what it is, you know, what the Wayne County Jail normally does is allows you to take the rest of that until we can get you an independent evaluation. Now, the problem with Prozac and Xanax, for example, right? So Ms. Richmond comes and says that she's taking these drugs. Now, these are very, very powerful drugs. And Ms. Richmond doesn't have them on her, okay? And all the mental health side of this case all testifies, you know what? Inmates come in all the time and misrepresent or misunderstand. But you also have Muftari testifying that the jail has called. When someone comes in and doesn't carry their drugs on them, then the jail asks that person, who's your doctor, who's your pharmacist, and then they call. I mean, it's one call to find out. But the record reflects that that call was never made. Isn't that correct? Yes. Ms. Richmond came in at night when all pharmacies probably would have been closed. Well, then the next morning at 9 o'clock. Well, for sure, but in the Wayne County Jail, judge, there's two tracks to take. So medical and mental health are different departments, okay? So oftentimes it's not left up to the medical nurses. You know, once you get a referral from a pharmacy. Well, I guess I'm sorry. Maybe we should ascertain whose job it is. Muftari talked about that being something that's regularly done. We've seen that in a bunch of cases. Fowler did the intake. Clafton, who was in charge of everything, says it's Fowler's job. Okay, it's Fowler's job. She can't call at 9 o'clock. Does she enter in the record? Please make this call. I'm back tomorrow. I'll make the call tomorrow. Or next person in the electronic medical records needs to make this call. Okay, no, she does not. And is it the policy of Wayne County not to make that call? No, I don't think. First of all, this whole case kind of turns on the testimony of, or this issue turns on the testimony of a social worker. So he's not even a manager. We didn't depose anyone who was in charge of mental health policy. So Mr. Muftari is going to talk from his experience. We make the argument. Well, Mr. Muftari is the gentleman to whom you have entrusted the psychiatric review when someone comes into your facility. So I'm hard-pressed not to assume that that is your choice and you've made it, and then his actions are your responsibility. I mean, in terms of responding as superior or something like that? No, in terms of employing the policies under which he's directed to act. Your Honor, I guess it's what Mr. Muftari says. Well, Mr. Muftari has been working in jail for a while. He's a professor. He worked in private practice. And what he said, okay, So he sees Ms. Richmond in December 28th, so less than two days after she gets there. So he sits down and does a complete evaluation. He notes that patient reports that she's taken these drugs in the past. I'm going to do a huge evaluation. I'm going to do a long evaluation. It's a long narrative. He testifies, I see no signs of withdrawal from psychiatric medications, which is what you're worried about. So the idea is that it takes a week, two weeks, three weeks for, if you are taking Xanax or Prozac, to start feeling any symptoms of withdrawal because they're kind of longer-acting drugs. So what Mr. Muftari says is that, Well, I don't know if you're really taking Prozac or Xanax, but I can see that you're generally in distress, so I'm going to get you an appointment with the only person who can give you psychiatric medications, which is a psychiatrist. So Mr. Muftari, as a social worker, can't prescribe medication. He can't go run to the pharmacy and hand it to you and say, Well, okay, that's what you're saying you're taking. He has to rely upon an M.D. to make the call. I understand that. So the question becomes, is there a policy or is there not a policy to follow up with the inmate's doctor or pharmacy to obtain the drugs through that facility, through an official doctor or through an official pharmacist, for that person to continue to take them? Because he did testify, it's a range of time, but it was three weeks out, wasn't it, before she had the actual meeting with the psychiatrist? Yes, Mr. Muftari said he expedited it in her case. He got her the earliest appointment and checked midway through the period to make sure she was going to keep the January 11 appointment. So he's working within an institution which he doesn't have. He can't force the psychiatrist to take an appointment, for example. I don't think anybody disputes that. What I'm trying to figure out is, what's the policy? He talks about calling the pharmacy and Clafton says that's Fowler's job, Fowler doesn't do it, he doesn't do it. What is the policy about contacting the physician or the pharmacy of an inmate who is taken into the jail? The best I can say is that it's on a case-by-case basis when they think it's necessary. Because there are cases where they call and there are cases where they don't. They don't necessarily make the call really quick. But it goes back to the fact that the Wayne County Jail mental health staff has an independent obligation to evaluate despite what outside people may have said. And it's a liability issue and it's a doctor-patient privilege thing. So when I go to one hospital and they give me a course of treatment and then months later I go somewhere else, the second hospital isn't necessarily bound to follow. Yeah, I understand that. I guess I'm just struggling because this means that your response is if the inmate shows up with the prescription medicine on them, they may take it. If they don't show up with the prescription medicine on them, you will not call the pharmacy to obtain it. No, it happens on a case-by-case basis where they think it's necessary to call. Again, sometimes it's something that's like, well, if you come in and you have a big gash on your arm, the jail staff can say, well, I know how to treat this. I don't need to search outside of the colonoscopy office. Let's say somebody comes in with a diabetic condition and they don't happen to have because they stepped out of their house to investigate why some event was happening and then that's when they're arrested. So they don't happen to have any diabetic treatment materials on them. What would the policy of the Wayne County Jail be there? Your Honor, if you say you're a diabetic in the Wayne County Jail, you're immediately put on a list. And the idea is that your blood pressure is taken. You get on the course of treatment. Immediately, as soon as you're admitted to the jail? Yes. And so if you're a, I don't know the psychiatric terms, but a schizophrenic and extremist, the same kind of thing would happen. Well, I mean, again, I think these mental health conditions have had differences of degree and severity. And what you're really worried about is that a social worker is thinking, look, I am kind of a gatekeeper, and I've got to make sure people are going where they're going. But the ultimate medical decisions are made about what is the course of treatment to take is done by a psychiatrist, right? And so when we're talking about individual liability, Agra Moftari can't do anything more because he's not in control. Well, he could put her in the inpatient, I guess. Part of what we're struggling with is obviously the context. This is a woman who has been taken to the hospital before she's brought to the jail because when she was arrested, she set herself on fire in the back of the police car. Now, that's indicative of pretty significant mental problems. Wouldn't you concede that? Well, she also had a blood alcohol content of 0.1. You know, she was also inebriated when it happened. So, I mean, it might be difficult to parse out, like, what is responsible for what. But it's got to be something that the jail would consider, that she set herself on fire. I think they did. I think it's important to remember that once Ms. Richmond sees Dr. Hinchman, she has no complaint. She's fine. Now, Dr. Hinchman prescribes... Dr. Hinchman does it, who's the only person in the medical record not sued for some reason. Like, out of all 11 people, he's the only one. Dr. Hinchman takes it to CSER and says, okay, you're a person requiring mental health treatment, and then prescribes her three drugs, none of which are Prozac or Xanax substitutes. Again, too, it would have been really easy in this case if there had been any evidence of what she was actually taking. Pharmacy records. Mr. Stella, stop. You've talked about things being done on a case-by-case basis. You've said that repeatedly in the face of questions about the jail's policy. And I want to go back to that, because somebody somewhere has to have responsibility for these people who come into custody. And I want to know where you assert... I mean, is your statement that the policy is, that there is no policy, and people at the jail on a case-by-case basis make a decision as to these people who are coming into custody? So is your statement that the policy is there is no policy with respect to how you deal with these mental health patients? I mean, my understanding... I guess the problem, Your Honor, is the reason why I'm struggling with this a little bit is that this is like an issue that came up late in this case. This is not even a theory that was pled in the complaint. I didn't get the affidavit from the head of the mental health saying this, because I didn't know until I filed my summary judgment brief that this is what we're talking about. And we'd already taken the depositions in this case. So, I mean, now the only source of what we're talking about... We never supposed Dr. Hinchman, which has been a good person to talk about what the mental health policy is, plaintiff to justice. All we have is a social worker, and the social worker's word is now we're supposed to extrapolate what happens in other cases and all cases because of what this one employee says. So in a little bit of a way, we're kind of litigating an issue that we don't... It didn't really get flushed out in discovery because that wasn't the focus until the end. Well, then just the hope is that you will tell us what's the policy. Well, I believe it's... I mean, I can only speak from my experience representing Wayne County and having knowledge of how this works, and the best answer I can give is case-by-case basis depending upon what the doctors are seeing. Some things the doctors can see, you know, that, look, I'd like to see the emergency room records, so I'll call over to the hospital and get those. Sometimes, like, well, I see what this is. I took an X-ray. It's a broken bone. I don't need to talk to their outside doctor. So it's kind of like... It goes back to the theme that the Wayne County Jail is not necessarily... You know, Wayne County Jail medicals have an independent obligation to treat you regardless of what you may or may not have done on the outside. And so what Dr. Clapton and Dr. Huck talk about, especially in the burn wound thing, is that, look, we're just as qualified as medical professionals as this emergency room doctor is to treat a burn wound, you know? And, you know, just because there was an emergency room or, you know, order, you know, whatever, or discharge instructions two weeks ago doesn't mean, like, this is relevant to my practice right here. Yeah, and I understand that because the record does show clearly that they chose one until the January 6th and January 11th date, one dressing change a day. But then they did not implement one dressing change a day. And your opposing counsel argues that the case law says that an inmate is entitled to the ordered care. And this was care ordered by your facility. So what is your response to why it was not deliberate indifference to fail to change the dressing on a daily basis? Your Honor, the dressing was changed for the most part on a daily basis. Well, the most part is not the question. I think there are several days in a row in January before she purportedly took over the changes herself. I understand that. But there are several days along the way that the dressing was just not changed. Well, can I address this two dressing change thing first of all? I mean, I don't, there's no evidence in the record there was two dressing change orders. I am fine. No, I don't think you need to address that because I think it's clear that they came in, you said one. And so let's assume that you are correct. So I'm asking you why it was not changed every day in accordance with your order. Okay, Your Honor, so on a, so I see what you're asking. You can go ahead and we'll continue. So the way this works is that the jail division one has a clinic. So there's a floor, right, for example. And the idea is that in the jail there's division of authority between the sheriff's office who runs the jail and the medical. There are different departments run by the medical. So what happens is that if you get a daily dressing change, right, the testimony is that it's usually done in the morning shift. So it's 7.30 to 3.30. And the way this works is a medical record keeper, not a nurse, will enter into the computer telling the sheriff's department that you need to bring down this inmate every day to the clinic. That's on all a computerized system. And so the way a person would come down the clinic is not because a nurse goes and gets, the nurse isn't going up on the floor. It's going to be a sheriff's deputy taking an order from a computer saying, okay, it's 8 o'clock, you, you, you, come with me. We're going down to the clinic. So nurses have nothing to do with that. Nurses are there. They're assigned to do duties. There's five, six, seven of them there on a shift. And they're given their assignment sheet, like you're doing these people, you're doing these people. So when a nurse is sitting there and says, well, so-and-so, Ms. Richmond's coming down for a dressing change, and I'm assigned her. So the deputy brings her down. Ms. Richmond gets called in, dressing gets changed, and she gets sent back up. But in cases where somebody may miss it, so we know she was at court at least one time. But there were a number of times she missed that were not explained. So assume that there were a number of times. Who should be responsible for that? Well, I don't, well, we never, I guess we never discovered the answer to that question in discovery. But the way this works is that if there's an order and the sheriff's deputy is supposed to bring you down, right? So one of two things can happen. A sheriff's deputy can forget to do it and not get you, you know, and there's nobody identified, you know. Well, a sheriff's deputy could just choose not to do it. A sheriff's deputy could choose not to do it, or the person could refuse and say, I'm fine, I don't need to come down. But the one thing that cannot happen is the inmate, the detainee cannot just choose to stroll down to the nurse's thing to get the dressing change. That's the one we know cannot happen in that institution. This is true. This is true. So what I mean, our argument is since this is a deliberate difference case and we're looking at individual people, and it's like, yeah, if the sheriff's deputy just callously decides that I'm not doing my job today, that person needs to get sued because these nurses aren't responsible. How on earth would a, how on earth would a prisoner know who was denying them the opportunity to get the dressing changed? In terms of, like, on the floor of the? Your basic point, as I understand it in this area, is that there was an individualized identification so that Ms. Richmond didn't say, it was Nurse Fowler who denied me a dressing change on Wednesday, and it was Nurse Jones who denied me a dressing change on Thursday. Well, if she had come down to the clinic, regardless of what, if she had actually made it to the clinic. But she can't walk down to the clinic, as Judge Donald has pointed out. She, Ms. Richmond, cannot choose to come down to the clinic. She can beg to come down to the clinic, but if they don't want to do it because they think she's somebody who set herself on fire and is mentally ill, they may not do it. And as your adversary said, it is not likely that Nurse Jones, whose job it is to take her down today, it's unlikely that that person is going to go to her cell or whatever and say, good morning, my name is Nurse Jones. I'm supposed to take you to the clinic, but I'm not doing it. That's not one of the things that's going to happen. So the question is, how is she going to know who it is that's either intentionally choosing to deny her that right or who is just dropping the ball? How is she going to know? Well, Judge, nurses don't take people down. It would be a sheriff's desk. So you're saying she should have sued the deputies for this deliberate indifference claim? Well, if she believed or had alleged in this case that my floor officer wasn't taking me down, that would be, yeah, I would go sue the officer. But that's not the testimony in this case, and that's not what happened. Okay, but does she know that it's the floor officer who's supposed to take her down? I mean, that was the point I thought you made earlier, Judge Moore, is that how does the inmate know whose job it is? How does she know that it's John, Ben, Sue, George? How does she know whose responsibility it is to do that and who is abdicating their job responsibilities? At Division 1, it's kind of hard to explain and paint a picture of this, but there are jail cells and there's a center duty station, and the inmates are most of the day out of their cell in this common area, and the inmates have the opportunity any time of day to talk to the duty officer right there sitting at a desk. That duty officer is not necessarily the person who actually brings them down, but for Ms. Richmond's case, I would imagine if she gets dressing changes eight days in a row and it's always a sheriff's deputy who escorts her down, she would probably maybe be on notice that that's who the person is. But her information sheet that she maintained said that she asked those people and that they would not take her down, and she kited in asking a kite that she be treated. My problem is if we accept that you have the right to order medical care, which is your position, then you also have to accept that it's your responsibility to see that it's completed. And I don't see that having occurred on all of the dressing changes, nor do I see it on the pain medication, because I understand that there's a medication call where the nurses go and deliver the medicine, right? Well, the prescription from Wayne County Jail is that she's to have a Loratab, one tablet every eight hours. But if you look at the information in the record, she did not receive three or four tablets a day. Routinely, she did not, and that was her other complaint that I can't get pain medication. So there, you're supposed to take it to her. So why is it not deliberate indifference to give her one Loratab one day when she's supposed to have one every eight hours? Well, Your Honor, part of the... Well, there's an explanation for that given, right? So, you know, if you look, in our brief, we kind of show, like, there's a chart. I mean, she's getting, I don't know, 75%, 80%, 85% of her hydrocodone, but also remember she has Tylenol on person with her as well. So she's not without pain medication. But I'm talking about your... My problem is that if I assume what you have argued, that you get to make and enforce your own order and it doesn't matter what somebody else has wanted, then, assuredly, under the law, it's your responsibility to see it's completed. So help me understand why it's not deliberate indifference for you not to have taken the Loratab to her every eight hours across the time period that she was there until they moved her off the Loratab prescription. Yes, Judge. We asked Nurse Maxine Hawk, who was the only defendant who was sued, that was just on duty once or twice in the whole period of incarceration. And we asked Maxine Hawk, what does it mean when a certain nurse is assigned to do that shift and they have a cart, you know, go sell and resell? So at midnight, so we're looking at midnight. So if Ms. Richmond was going to miss or not get one, it was going to be at 12 p.m. What Nurse Maxine Hawk said is that if inmates are sleeping, we often don't wake them to give them pain medication. But I don't see any notations in the electronic medical records that a plaintiff was asleep. Well, I mean, it would mean that the nurse just didn't notice. I mean, they're only writing down when they actually have given it to someone. And some of the medical records show that during the day hours, there was only one Loratab given all day long. Isn't that in violation of your order? I mean, the real question here is, when do you step over the line between just messing it up and qualifying as deliberately indifferent? And the issue here is, are we not at that material dispute of fact as to that very issue? Your Honor, I hate to sound like a broken record on this, but, I mean, which named defendant didn't do it? Oh, look at the reply brief. The case law in the Sixth Circuit, I think Beretti and other cases, says if you designate the shift on which the service was to be rendered and you find out who was the person assigned to that shift, that's an adequate identification. And that's exactly what the reply brief does. Well, Your Honor, I don't, I mean, for example, I mean, there's no identification of midnight on January 24th missing Loratab. Who was that nurse? Well, there is some identification of who was in charge of doing the dressing changes at a certain shift. You had the day shift and the afternoon or evening shift. The reply brief, in fact, does that. Well, Your Honor, all nurses that have been sued in this case were on a day shift. Well, I mean, except for, I think, Siobhan Fuller. I think there was one that was on night shift. Day shift people. So, you know, the problem is that if Ms. Richmond is missing a midnight medication, nobody sued here does that job on a midnight shift. I guess my struggle is, counsel, what I'm hearing is we have the right to make the orders. We only have to observe our own orders. And then the response to that is you can't tell me who didn't do it. I think if you're in charge of a jail, you don't get, everybody doesn't get to step up to the deposition desk and say, not me. Must have been them. Did you sue them? No, it must have been that person. If you run a different nurse every day through the day shift, then isn't it the jail's job to assure that the dressing that needs to be changed during that morning hour is done by the nurse on duty? Otherwise, it feels like you're creating a system that automatically allows everybody else to say, wasn't my job, and yet then defy your own medical orders. I don't see that that works. Well, Your Honor, I understand your position that, you know, it's not, you know, it's like fair to a plaintiff to point fingers, but I guess at the same time it's not fair to not sue the right people. I mean, the idea is that... Well, the issue in this case, the issue in this case, counselor, is there's a significant objection from your side that you won't let any of these people go. This is such a complicated case because you kept everybody in. Well, what if they kept everybody in because everybody blames everybody else? Then the question is, were you deliberately indifferent, even if in your structural method of implementing your orders, you fail to assure that they are implemented? And then we're in Monell land. Well, I mean, that's certainly possible. But, I mean, I guess in terms of this case, I mean, it's like 1983 individually, Monell being something else, it's like we look at individual people and what their job was and what they did or didn't do. And if counsel says she did not get a morning dressing, a day dressing change which should have been in the morning on these eight days, here are the nurses that were in charge of that, 1, 2, 3, 4, 5. They are the people who did not do it. Is your answer that, well, we ordered it and they were supposed to be the ones to do it, but it's the sheriff's fault? I mean, I'm struggling with that. I mean, I think it's part of, you know, having worked for the county for a few years, I think it's a little bit bizarre, too, that we have this, I mean, the executive department of the county runs general medical, the Wayne County elected sheriff runs the sheriff's department, they work in the same environment, but don't take orders from each other. And it's been like this for decades. Well, systemic problems that impact the medical care that you are supposed to be delivering to inmates, the responsibility stops at your all's desk, doesn't it? Well, for sure, but I mean, I've been doing a lot of 1983 pieces. I mean, yes, sometimes it's hard to find the right person, but you've got to find the right person. The reason why Melissa Richmond did not come down to the jail clinic on a couple of days not to get her daily dressing change, if it was because a sheriff had an order to do it and didn't do it, you know, I would see that is the person pulling the bag. The reason why she's not getting what she wants is you didn't, this person in the chain of command and in the team. Well, but you could say that the policy has to be changed or else the medical people should be liable for not assuring that their patients are brought down. So they should have a record of how many times Melissa Richmond was getting the dressings changed. And when they see on a daily basis that she's not coming down hypothetically, then they have a duty to say, aha, there's a glitch in the system. We know Melissa Richmond needs her dressing changed every day because it is a serious burn, and therefore we're going to step up and tell the sheriff, bring Melissa Richmond down. Well, for sure, I mean, that sounds like a reasonable solution, but again, I think there's a gap in the case where we, you know, nobody went down this road that probably should have been explored. So I'm looking at this case through the eyes of career nurses who come to work every day, work at a 1,700-person facility. It's a very difficult job and a high-volume job. And the only way this can work is if everybody's doing their job and we have an assembly line kind of thing. And so you have a vested interest in making sure that all of those people are, in fact, doing their job, enforcing their orders, and you have an interest in identifying those who are not enforcing the orders or doing the job. For sure. I mean, it's difficult to extrapolate from Miss Richmond's situation if this even happens on a regular basis. Like, again, the nurses testified who don't do this job, like, well, we're going to guess that if you don't come down on the morning shift, right? So the idea is that if she's a court, she's supposed to get changed on the afternoon shift. That's a different group of people, you know, that would have done that. But in a case that she's missing it on the morning shift, right? So the nurse is like, you know, this happens. Patients are sleeping. Patients don't want to come down. I mean, that's usually what's happening. And this lawsuit is helping you tee up or shine some light on some of those. Well, we thank you. Your red light has been on for a while, but important questions in the case. Well, I must just say at the outset, I really am impressed and appreciate the breadth of understanding of both the issues and the facts that you have displayed just by virtue of your questions. And I really have nothing more to add unless you have specific questions for me. But I do think, of course, that defense counsel basically stated that there is no policy at the Wayne County Jail with respect to inmates getting the continuity of care based upon the timely access to their medications. It's an ad hoc policy at best on a case-by-case basis. And for that reason and all the other reasons previously stated, I would request the court reverse the orders of the district court and reinstate this case. Thank you. Thank you. Thank you both for your argument. The case will be submitted. And would the clerk adjourn court?